# Richmond.

## CLAY'S ADMINISTRATOR V. KELLY.

### March 15, 1917.

1. PARTNERSHIP — *Equity Jurisdiction—Accounting—Disclosure.*—A partnership was formed to obtain and carry out a government contract. After the contract was obtained one of the partners, K., wished to withdraw and did so, receiving a consideration of five hundred dollars ($500) from the other partners. After his withdrawal he had no connection with the firm, except as one of the guarantors on the bond to the government. The partnership, unable to carry on the government work itself, desired to assign its contracts to another firm, M. & J., upon terms which promised a substantial profit to the partnership. But the firm, M. & J., upon assuming the contract, demanded the signature of the retiring partner, K., to the contract of assignment. This he refused to give without compensation, and under protest the partnership agreed to pay him one-tenth of the profits which it might realize from the contract with M. & J. The second firm, M. & J., finding itself unable to carry on the government contract, entered into an agreement with the partnership, by which their contract with it was canceled, and surrendered to the partnership the construction outfit on the site of the government works. The partnership then entered into a contract with a third firm, whereby the third firm took over the construction plant and the work to be done under the government contract, agreeing as a consideration for the transfer to pay the debts of the second firm, M. & J., which had been assumed by the partnership, and also to pay the partnership the sum of $65,000. To these two last transactions the retiring partner, K., was not a party. The retiring partner instituted a suit in equity against the partnership for a disclosure and an accounting. The defendants demurred to the bill on the ground that its allegations did not sufficiently charge a new partnership, which they alleged was essential to the standing of the complainant in a court of equity.

   *Held:* That complainant's relationship to the firm, as shown by his averments, was not that of a full partner, but it was such, and the subject of the controversy was such, as to entitle him, upon the fundamental principles of equity jurisprudence which

underlie the jurisdiction in partnership cases, to bring his suit in that forum. The relationship alleged was, in form and substance, of a fiduciary character; some of the items making up the alleged profits were particularly within the knowledge of the defendants; the keeping of the account of all the profits was especially within their duty and power; and the case thus appears plainly one for equity jurisdiction.

2.  PARTNERSHIP—*Construction of Contract of Partnership.*—The retiring partner,. K's contract, when he re-entered the firm, provided that he should receive "one-tenth of the profits that may be realized by said firm in the matter of the contract with M. & J." His bill distinctly set out the subsequent contracts and transactions and claimed a share in the profits derived therefrom by the appellants upon the theory that these profits were realized by them in consequence of the M. & J. contract, though not directly thereunder. Defendants excepted to certain testimoney disclosing the transactions whereby they, after the surrender of the plant by M. & J. arranged with a third firm to complete the work; insisting that the testimony was improper because the bill stated a case under which the complainant could only recover by showing that profits were realized directly from the M. & J. contract.

    *Held:* That under the bill such testimony was properly admissible.

3.  PARTNERSHIP — *Bill for Accounting — Objection to Evidence.*— . Shortly after the final assignment of the government contract, and in pursuance of the contract with the assignees, a receiver was procured for the partnership, and thereby certain technical difficulties were obviated, and the transfer of the government contract was perfected.

    *Held:* That although the complainant was not a party to that suit, the record might be introduced by him to show the facts appearing therein as to the transfer of the contract, the disposition of the assets of the firm, and the payment therefor. The matters shown in that record were not within the rule of evidence as to *res inter alios acta.* They were independent, material facts, proved by the record, charged in the complainant's bill, and proper as evidence to support his case.

4.  DURESS—*Partnership.*—K., upon retiring from the partnership, as set out above, was under no obligation of duty, contractual or otherwise, to the defendants. Being under no obligation to sign the contract of assignment, and preferring not to do do so at all, even for a consideration, there was no foundation upon which to rest any claim of duress in the procurement of the new agreement by which he was to receive a share of the profits.

5. CONTRACTS—*Consideration.*—K., the retiring partner, had been of service to his partners in securing the government contract and giving the necessary bond. He remained bound under both so far as the government and the surety company were concerned. These facts constituted abundant consideration for the $500 which the partnership paid him upon a final settlement and termination of their relations with him as an associate under the original contract.

6. CONTRACTS—*Consideration.*—The contract of the partnership to pay K. a share of the profits upon his signing the contract with M. & J., rested upon sufficient consideration. His signature resulted in both a benefit to the appellants and a risk to himself.

7. CONTRACTS—*Consideration.*—A valuable consideration is a benefit to the party promising, or to a third person at his request, or an inconvenience, loss, or injury, or the risk of it, to the party promised.

8. PARTNERSHIP—*Profits.*—K., the retiring partner's new contract with the partnership upon his signing the contract with the firm of M. & J., provided that he was to receive "one-tenth of the profits that may be realized by said firm in the matter of the contract" entered into by said firm with M. & J. The defendants contended that the profits realized were not in the matter of the contract with M. & J., but were derived from the contract with the final assignee.

   *Held:* That the profits must be regarded as profits realized by the firm in the matter of the contract with M. & J.

Appeal from a decree of the Chancery Court of the city of Richmond. Decree for complainant. Defendant appeals.

*Affirmed.*

The opinion states the case.

*Leake & Buford, A. W. Patterson,* and *Cutchins & Cutchins,* for the appellant.

*A. L. Holladay* and *Kelley & Coulbourn,* for the appellee.

KELLY, J., delivered the opinion of the court.

This suit in equity, for a disclosure and accounting, was instituted by Michael Kelly against S. P. Cowardin, James F. Bradley, Thos. E. Stagg and S. P. Clay, his former partners in a certain construction contract. Pending the suit S. P. Clay died, and the cause was revived against his administrator. This is an appeal from a decree settling the principles of the cause in favor of the complainant and directing an account.

The transactions leading up to this litigation are simple enough in themselves, but any intelligent narration of them must necessarily be somewhat prolix.

On March 24, 1903, all of the parties named above, Cowardin, Bradley, Clay, Stagg and Kelly, entered into a partnership agreement, under the firm name of Cowardin, Bradley, Clay & Co., for the purpose of bidding on a contract with the United States government for the erection of a water filtration plant in Washington city. Cowardin, Bradley and Clay were to be the active managers. Stagg and Kelly were to furnish $10,000 each, as the first capital of the firm, if the contract was awarded to it, and when the $20,000 thus provided was exhausted, all the partners were to be equally obligated to assist in raising any needed funds. Except as here indicated, and as to the further obligation to assist the others in securing bonds needed for the bid and contract, Stagg and Kelly were not required to render any other services, but were to have an equal voice in the management of the affairs of the firm.

Their bid, of $989,000, was accepted. A preliminary bond of $150,000 was executed by all the members of the firm, and this was superseded in a few days by a final bond for $200,000, likewise executed by each member, and also by a bonding company as surety; and, on April 6, 1903, the contract between the government and Cowardin, Bradley, Clay & Co. was duly executed.

About this time Kelly became anxious to sever his connection with the contract. It is not entirely clear from the evidence that his written request for release stated all his reasons, but the material fact in this connection is that on April 4, 1903, he wrote a letter to the firm in which he said: "I have been very much disappointed in financial matters and besides my health is failing very much; I find it impossible to raise the necessary funds to comply with my promises and wishes. I therefore ask most respectfully to be relieved of any and all obligations that I have entered into, and wishing you great success," etc.

On April 7, 1903, just one day after the contract was closed with the government, Thos. E. Stagg, acting for himself and for Cowardin, Bradley and Clay, paid Kelly $500 in cash and Kelly signed a paper presented to him by Stagg, reciting the original partnership agreement, the contract between the partnership and the government, and containing also the following recital and agreement:

"Whereas, now the said M. Kelly expresses his inability to comply with one material condition of said copartnership, and desires to be released from the terms and obligations to provide the sum of Ten Thousand Dollars, as aforesaid, but having by his aid and credit, jointly with each of said parties secured the necessary bond required by the United States government, and is bound for the completion of said contract;

"Now, therefore, this agreement witnesseth, that for and in consideration of the premises, as well as the sum of five hundred dollars, paid to the said M. Kelly, and in further consideration that the said M. Kelly shall be relieved of any duties and all further liability incurred by reason of the prosecution and completion of the aforesaid contract with the United States government, the said M. Kelly doth acknowledge his liability to the Fidelity and Deposit Company of Baltimore as the guarantor on said bond, and doth

agree that he is not further interested in any way in the said contract with the United States government, and that he will not assert or make any claim for any profits arising thereunder."

This transaction was the end of Kelly's dealings with his former partners and of his knowledge of what they were doing under the contract, until he was requested to meet them in Washington on May 26, 1903.

Meanwhile, Cowardin, Bradley, Clay and Stagg, continuing in the enterprise under the firm name of Cowardin, Bradley, Clay & Co., began work under the contract with the government, and got together a small equipment, but were financially unable to make very substantial progress, and soon concluded that their only chance to realize any profit for themselves or to perform the obligations they had assumed, was to transfer their contract to some other person or firm having the ability to carry it out. After some negotiations with other persons had failed to materialize, the contracting firm of May and Jekyll made a proposition which resulted in a contract, prepared by the attorney for May & Jekyll, by which they obligated themselves to take over and complete the work on terms which promised a substantial profit to Cowardin, Bradley, Clay & Co. This contract as prepared, and as finally executed, designated Kelly as one of the partners in the last named firm, required his signature, and upon its face made him in all respects a party thereto, bound by all its obligations and entitled to all its benefits, exactly as the other partners were. When it was explained to the attorney for May & Jekyll that Kelly was no longer interested in the contract, he insisted that Kelly's signature was essential in order to insure the approval of government representatives who would have to pass upon the contract. Thereupon, on May 26, 1903, Cowardin and others sent an urgent message to Kelly in Richmond, requesting him to come to Washington at once, and he did so.

Upon his arrival in Washington, the situation was explained to him and he was requested to sign the contract. This he declined to do without some promise of compensation. The evidence is conflicting upon some points as to what followed, but it is clear that Kelly much preferred not to sign the contract, even for a consideration, and that without some consideration he would not have signed it at all. His attitude led to considerable acrimony among the parties. Cowardin and others sought the advice of their own counsel, and were advised to agree under protest to Kelly's terms. Thereupon, Cowardin, Bradley, Clay and Stagg signed and delivered to him a paper in these words: "We and each of us, co-partners under the firm name of Cowardin, Bradley, Clay & Co., hereby agree with Michael Kelly to pay him one-tenth of the profits that may be realized by said firm in the matter of the.contract this day entered into by said firm with May & Jekyll of New York City." Kelly disclaims any recollection of a protest, but the weight of the evidence shows that the other parties first offered him a written agreement to pay the ten per cent, embodying in the writing a protest; that he indignantly refused to accept this; that they then offered him the paper above quoted which he accepted, and accordingly signed the May & Jekyll contract; that then Cowardin, speaking for himself and others, reminded all the parties present that he had protested against agreeing to pay the ten per cent "and intended never to make the payment."

On August 25, 1903, May & Jekyll, who were then apparently in a failing condition financially, entered into a written contract with Cowardin, Bradley, Clay and Stagg, under the terms of which the contract of May 26, 1903, was cancelled and the former firm surrendered to the latter the construction outfit on the site of the filtration plant, and all the rights and contracts connected therewith. And, on the same day, Cowardin, Bradley, Clay and Stagg entered

into a contract with the firm of Dean & Sibley (acting for the Sand Filtration Company of America then about to be incorporated and organized) whereby Dean & Sibley took over the construction plant and the work to be done under the government contract, agreeing as a consideration for the transfer to pay the debts of May & Jekyll amounting to $34,176.10 which had been assumed by Cowardin, Bradley, Clay and Stagg, and also to pay the latter firm the sum of $65,000. This last named contract was, manifestly from the record, entered into with the knowledge, consent and co-operation of May & Jekyll, and the two contracts of August 25th were essentially concatenated and interdependent. Kelly was not a party to either of them, but in each Cowardin and his associates agreed to hold the other parties harmless against any loss resulting from that fact.

Shortly thereafter, pursuant to one of the stipulations in the Dean & Sibley contract, a receiver was procured for Cowardin, Bradley, Clay & Co. in a suit instituted in the Supreme Court of the District of Columbia, and thereby certain technical difficulties, not necessary to notice further, were obviated, and the transfer of the government contract to Dean & Sibley was perfected.

The first assignment of error is that the court improperly overruled the demurrer to the bill. The ground of demurrer chiefly relied upon is that the allegation "touching the formation of a new partnership between Kelly and the defendants on May 26, 1903, is obscure," and does not sufficiently charge any such new partnership; and the argument advanced is that the existence of a partnership relation between the parties is essential to the standing of the complainant in a court of equity.

The bill alleges the original partnership, the retirement of Kelly therefrom, and his subsequent coming back into the firm, for a purpose and upon a consideration therein specifically set out. The contract with May & Jekyll, filed

with the bill, shows upon its face that he executed it as a member of the firm, and the collateral contract, also filed with the bill, defines the interest which he was to have in the profits realized "in the matter of" the former contract. The bill further alleges that Cowardin, Bradley, Clay and Stagg realized $65,000 in profits arising out of that matter, in addition to certain percentages retained by them on payments by the government while May & Jekyll were in charge of the plant, and other profits, the sources and amounts of which complainant does not know; and the prayer of the bill is for a disclosure and accounting. Complainant's relationship to the firm, as shown by his averments, was not that of a full partner, but it was such, and the subject of the controversy was such, as to entitle him, upon the fundamental principles of equity jurisprudence which underlie the jurisdiction in partnership cases, to bring his suit in that forum. The relationship alleged was, in form and substance, of a fiduciary character; some of the items making up the alleged profits were particularly within the knowledge of the defendants; the keeping of the account of all the profits was especially within their duty and power; and the case thus appears plainly one for equity jurisdiction. Merwin's Eq., sec. 581, 584; Lile's Notes to same, p. 116; *Wilson* v. *Miller,* 104 Va. 446, 448, 51 S. E. 837. The demurrer was properly overruled.

There was also a motion made, after the evidence was all in, to dismiss the bill upon the ground that the proof failed to show a case for jurisdiction in equity, even if the allegations of the bill were sufficient for that purpose. The court overruled the motion, and its action in doing so is made the basis of the second assignment of error. In our view of the case, the evidence was entirely sufficient to establish the relationship and the character of the controversy upon which the complainant invoked the equity jurisdiction in his bill, and upon which we have sustained his resort to that forum. There was no error in overruling the motion.

The next ground upon which we are asked to reverse the decree is that the court overruled certain exceptions to testimony and evidence introduced by the complainant.

It appears that the cause was argued and submitted some time before the decree appealed from was entered, the court in the meantime having it under advisement; that on November 15, 1915, the decision was announced in a written opinion; and that on December 8, 1916, the decree was entered, containing the following pertinent recital: "And this day at the entry of the decree carrying into effect the opinion of the court, the defendants, by counsel, moved the court to pass on the exceptions of the defendants shown in the depositions to have been taken to certain of the evidence of the plaintiff, especially their exception to the admissibility of said transcript of the record from Washington, and the court declined to pass on any of said exceptions because they were not pointed out and urged in the argument of the counsel at the time the cause was argued and submitted."

Independent of any question as to the waiver of these exceptions, the appellants have not been prejudiced concerning them. The exceptions relate to certain testimony disclosing the transactions whereby the appellants, after the surrender of the plant by May & Jekyll, arranged with other parties to complete the work; and it is insisted that the testimony was improper because the bill stated a case under which the complainant could only recover by showing that profits were realized directly from the May & Jekyll contract. We do not so understand the bill or the complainant's rights. The bill distinctly sets out the subsequent contracts and transactions, and claims a share in the profits derived therefrom by the appellants upon the theory that these profits were realized by them in consequence of the May & Jekyll contract, though not directly thereunder. This theory was justified by the terms of the contract which promised Kelly "one-tenth of the profits that may be real-

ized by said firm in the matter of the contract with May & Jekyll," and the evidence was proper as tending to sustain that theory. And, with reference to the record of the receivership suit in the Supreme Court of the District of Columbia, which was introduced by the complainant, and to which this assignment of error is likewise directed, the same may be said. It is true, as pointed out by appellants, that Kelly was not a party to that suit, but the record was introduced by him, not against him, and was proper to show the facts appearing therein as to the transfer of the contract, the disposition of the assets of the firm, and the payment therefor, in all of which the appellants were parties and active participants. The matters shown in that record were not, as counsel for appellants contend, within the rule of evidence as to *res inter alios acta.* They were independent material facts, proved by the record, charged in the complainant's bill, and proper as evidence to support his case. See Broom's Legal Maxims (8th ed.), 958, *et seq.*

We come now to the assignment of error upon which we understand appellants to place their chief reliance, and naturally so because, if sound, it would furnish a basis for reversal, going to the merits and substance of the controversy rather than to the form in which the controversy is presented. This assignment challenges the validity of the contract for one-tenth of the profits on the grounds, (1) that it was obtained through duress, and (2) that it was without consideration.

To maintain the contention that the contract was obtained by duress, the appellants rely upon the testimony of Mr. Darlington, a distinguished member of the bar of the Supreme Court of the District of Columbia, who stated, as an expert and in answer to an hypothetical question, that in his opinion "the contract would not form a basis of recovery in the District of Columbia." The facts assumed in the hypothetical question brought the execution of the contract,

in his opinion, within the doctrine of duress as announced "in the case of *Swift Co.* v. *United States,* 111 U. S. 22, 4 Sup. Ct. 244, 28 L. Ed. 341, and particularly within the English case of *Parker* v. *Great Western Ry. Co.,* 7 M. & Gr. 253, cited and approved by the court in that case." Mr. Darlington's testimony is claimed by appellants to be conclusive, since the contract was made and was to be performed in the District of Columbia, and no evidence was offered in conflict with his statement of the law. It is perfectly apparent, however, that the hypothetical question assumed, or at least that he certainly understood it to assume, that there was some legal obligation on Kelly's part to sign the contract. This is the crucial point, both as to the alleged duress and the alleged want of consideration. The law, as testified to by Mr. Darlington, does not seem to be different in the District of Columbia from the law elsewhere generally upon the subject of duress, as involved in this case. The doctrine as stated by Judge Harrison in *Harris* v. *Cary,* 112 Va. 362, 71 S. E. 551, Ann. Cas. 1913 A, 1350, and as quoted and relied upon by appellants, is as follows:

"The doctrine appears to be well established that where one party has possession or control of the property of another and refuses to surrender it to the control and use of the owner, except upon compliance with an unlawful demand, a contract made by the owner under such circumstances to emancipate the property is to be regarded as made under compulsion and duress. Nor can it be doubted that a contract, procured by threats inducing fear of the destruction of one's property, may be avoided on the ground of duress, there being nothing in such a case but the form of a contract, wholly lacking the voluntary assent of the party to be bound by it. To constitute duress, it is sufficient if the will be constrained by the unlawful presentation of a choice between comparative evils; as, inconvenience and loss by the detention of property, loss of prop-

erty altogether, or compliance with an unconscionable demand."

This doctrine, however, does not apply here, because the element of an unlawful demand is lacking. The contract of April 7, 1903, whereby Kelly was released from any further obligation so far as Cowardin, Bradley, Clay and Stagg were concerned, is not correctly interpreted in the hypothetical question answered by Mr. Darlington. The dominant purpose of that contract, to which he was not required to attach his signature, was not to sell Kelly's interest, but to release him from the contract and from all its burdens and obligations. He had, however, already been of service to his partners in securing the contract and giving the necessary bond, and he remained bound under both so far as the government and the surety company were concerned. This latter fact prominently appears in the release contract, and it was an abundant consideration for the $500 which they paid him upon a final settlement and termination of their relations with him as an associate under the original contract. The opinion of the learned judge of the lower court deals somewhat elaborately with this phase of the case, and we quite agree with his conclusion that, "on May 26, 1903, Kelly was under no obligation of duty, contractual or otherwise, to the defendants." And this is necessarily the end of the contention that Kelly procured the contract for a share in the profits by duress. Being under no obligation to sing the May & Jekyll contract, and preferring not to do so at all, even for a consideration, there is no foundation upon which to rest any claim of duress in the procurement of the agreement which he now seeks to enforce.

What has been said to show that there was no duress upon the part of Kelly, practically disposes of the further contention that there was no consideration for the contract for a share in the profits. With no obligation upon him to

do so, he signed, at the instance of appellants, and with little opportunity for deliberation, an involved and complicated contract with May & Jekyll which appellants' counsel insist placed him under no further obligations and subjected him to no further risks than already rested upon him by virtue of the government contract and bond, and which, on the other hand, counsel for appellee insist enhanced and added very materially to those risks and obligations. The judge of the lower court took the latter view, and demonstrated the correctness of it in a partial analysis of the contract which, as he said, might have been still further elaborated in vindication of his conclusion. The numerous transactions and contracts involved render it impossible, in an opinion of reasonable length, to discuss them all in any great detail, and it must suffice here to say that no one, without obligation to do so and without consideration for doing so, could have been expected to become a partner with Cowardin and others in the May & Jekyll contract, and that there were risks and obligations incurred thereunder which were different from and in addition to those imposed by the original contract with the government. It is beside the mark to argue that Cowardin and others were about to fail, that their failure would have resulted in loss to Kelly under the government contract and bond by which he was still bound, and that if the deal with May & Jekyll succeeded it would enure to Kelly's benefit. If he had never been released from the original contract, he could not have been compelled to sign a second one. It was his privilege to choose between the risk of this first loss that seemed to face him and a second one which could very possibly have been greater than the first. His signature resulted in both a benefit to the appellants and a risk to himself. "A valuable consideration is a benefit to the party promising, or to a third person at his request, or an inconvenience, loss, or

injury, or the risk of it, to the party promised." 4 Min. Inst., pt. 1, p. 22.

This disposes of the substance of all the assignments of error, except one which charges that the court erred in finding that the defendants had realized profits from the contract of May 26, 1903. That contract was an indirect transfer of the government contract, and contained a stipulation that if May & Jekyll failed to carry out their contract, they should surrender the plant, upon specified terms, to "the parties of the first part" to complete the work. Kelly was one of the parties of the first part. He was not consulted when May & Jekyll failed, and the plant was surrendered to Cowardin and others under terms which, by mutual agreement, were different from those originally specified for the surrender. The government contract was then completed, under the circumstances already briefly outlined, and appellants realized a profit of $65,000. We have no difficulty in holding that this sum, as well as any net amounts they may have realized while May & Jekyll were doing the work, must be regarded as profits "realized by the said firm in the matter of the contract" with May & Jekyll. Appellants insist that this sum was profit from the government contract, and not from the May & Jekyll contract which failed of completion. The argument proves too much. A primary contention of the appellants is that it was the duty of Kelly to sign the May & Jekyll contract since that contract provided a means of rescuing the parties from financial ruin; and, as a matter of fact, it was a very important factor in the final completion of the government contract. We have seen that Kelly was under no duty to sign the agreement, but it can hardly be consistently argued that profits which his signature to the May & Jekyll contract made possible were not in the contemplation of the parties as profits "realized from the matter of" that contract. The lower court disposed of this question as follows:

"As to whether there were any profits: The defendants did make gains or profits to the amount of a large sum; that these gains were profits arisng from the contract has been decided by the Court of Appeals, District of Columbia, and by the Supreme Court of the United States, where the May 26, 1903, contract was up for consideration, see the case of *Sand Filtration Corporation* v. *Cowardin,* 29 App. D. C. 571, and the same case 213 U. S. 560, 29 Sup. Ct. 509, 53 L. Ed. 833."

It is quite true that Kelly was not a party to the litigation between Cowardin & Co. and the Sand Filtration Corporation in the Federal courts, and that the issues there were different from those in the instant case; but it is apparent from the opinion of the Court of Appeals of the District of Columbia and of the Supreme Court of the United States, cited above, that both courts regarded the profits realized by Cowardin & Co. as having been an outgrowth of the May & Jekyll contract. Nor do we see how they could be otherwise regarded. The chief consideration for the $65,000 paid by the Sand Filtration Corporation was the plant and equipment acquired from May & Jekyll; and it was by virtue of the contract with them that the appellants finally secured the performance of the contract with the government.

The decree of the chancery court, in our opinion, was right in all respects, and must be affirmed.

*Affirmed.*